COURT OF APPEALS OF VIRGINIA

Present:   Judges Kelsey, Huff and Senior Judge Clements
Argued at Chesapeake, Virginia


RYAN MICHAEL HART

                                                   MEMORANDUM OPINION[*] BY
v.        Record No. 1724-11-1                     JUDGE D. ARTHUR KELSEY
                                                   JUNE 5, 2012

ROBIN BARNETT HART

              FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
                        Marjorie A. Taylor Arrington, Judge

              Thomas M. Wolf (Joseph M. Rainsbury; LeClairRyan,
              P.C., on briefs), for appellant.

              Kristi A. Wooten (Robin Michelle Barnett, *pro se*, on
              brief), for appellee.[1]


        In this hotly contested divorce case, the trial court granted sole physical custody of two

young children to their mother, Robin Barnett Hart (wife).  The court awarded visitation

privileges to their father, Ryan Michael Hart (husband), but required that visitation be supervised

"at this point" in time.  App. at 181.  The court also admitted an expert report into evidence,

considered the recommendations of the guardian *ad litem*, awarded wife a portion of her attorney

fees and costs, and, split the guardian *ad litem* fees and costs evenly between the parties.  Finding

no reversible error in any of the trial court's decisions, we affirm.

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] For reasons that are not clear from the record, the children's guardian *ad litem* filed
exceptions to the final decree, R. at 1260, and attended the appellate argument but did not file a
brief or argue on appeal.  See Rule 5A:19 ("The brief of . . . the guardian *ad litem* shall be filed"
unless the "guardian *ad litem* joins with either appellant or appellee" by notifying the "Clerk's
Office, in writing, which side it joins" so that it "may rely on the brief of that party and is entitled
to oral argument under Rule 5A:26."); Judicial Council of Va., Standards to Govern the
Performance of Guardians *Ad Litem* for Children, Standard J, at S-3 to S-11 (2003) ("In fulfilling
the duties of a Guardian *ad litem* (GAL), an attorney shall: . . . File appropriate petitions,
motions, pleadings, briefs, and appeals on behalf of the child and ensure the child is represented
by a GAL in any appeal involving the case.").

I.

When reviewing a trial court's decision on appeal, "we view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences." Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003) (citations omitted). "That principle requires us to discard the evidence of the appellant which conflicts, either directly or inferentially, with the evidence presented by the appellee at trial." Brandau v. Brandau, 52 Va. App. 632, 635, 666 S.E.2d 532, 534 (2008) (citation omitted). These principles create a prism through which we view the evidence at trial and have considerable efficacy in cases where, as here, the evidence is highly contested.

At an evidentiary hearing spanning twelve days, the trial court heard testimony from the parties and more than twenty fact witnesses and experts. The parties introduced more than thirty exhibits, not counting exhibits and affidavits attached to post-trial motions. In all, the appellate record contains twenty-seven transcripts, six trial court manuscripts, and three sealed exhibit envelopes, as well as three sealed guardian *ad litem* reports.[2] We will discuss only those aspects of the factual record pertinent to our decision and will do so in the context of husband's arguments on appeal.

At the time of trial, husband and wife were both naval officers. Husband served as a lieutenant at the Department of Defense Joint Intelligence Operations Center. Wife served as a naval cryptology officer with NATO's Allied Command Operations as the Executive Officer for the NATO Civil-Military Fusion Centre. They married in 2003 and had two children — a son in 2005 and a daughter in 2007. Husband and wife separated in 2008.

---

[2] To the extent we mention facts found only in the sealed record, we unseal only those specific facts, finding them necessary to decide the case. The remainder of the previously sealed record remains sealed.

A. Supervised Visitation

Husband filed for divorce and sought custody of the children. At trial, wife alleged that their brief marriage ended for various reasons, including her belief that husband had sexually molested one of the children, his inexplicable refusal to engage in conjugal relations with her, his addiction to prescription drugs and alcohol, and his increasingly erratic behavior. Husband denied these allegations.

In support of her request that husband's visitation with the children be supervised, wife testified that, prior to their separation, husband chronically drank alcohol to excess and abused prescription drugs. When asked if she had any "concerns about Mr. Hart's interaction with the children for the future, from now going forward," wife testified:

> My concerns now going out would be the fact that I believe that he has serious drug and alcohol issues. I experienced them throughout our whole marriage. We went to three separate therapists to try to fight this battle with alcohol, and then the drugs after he was diagnosed with the GERD and had access to the serious opioids in 2007, which took him away from me.

App. at 827. Husband "drank every night," wife said. Id. at 916. The trial court inferred from wife's testimony that husband "commonly mixes alcohol and prescription drugs during his personal time and loses control." Id. at 174.

In 2008, wife discovered a psychological evaluation of husband performed in 2000.[3] At that time, husband reported "fairly heavy drug use in graduate school; it helped him concentrate and reduced his anxiety." Id. at 211. His mother reported "significant emotional issues" and

---

[3] Husband offered into evidence a report issued in 2009 by the Behavioral Medicine Institute of Atlanta, App. at 208-19 (Plaintiff's Ex. 2), that summarizes the Aug. 2, 2000 "Neuropsychological Evaluation Report" by Dr. Brett Leimkuhler, Ph.D., at the Center for Neuropsychology and Learning Disorders. Id. at 210-12.

saw him as "depressed" and, the evaluation report recounts, he "tends to be anxious, manic, and hyperactive." Id. After receiving a prescription for Oxycontin to treat migraines:

> It became a reality to him that after the headache stopped, he could not stop using the Oxycontin. He began doctor shopping and was taking Oxycontin daily, 30 to 40 mgs per day, for one year. This was 1997 to 1998. Mr. Hart's friends and parents told him that he needed help and needed to stop . . . . He visited a few facilities in California, and his mother came out to help him find treatment for his Oxycontin addiction.

Id. at 215. "Mr. Hart was treated by a psychopharmacologist who used benzodiazepines . . . to prevent him from withdrawal while titrating the Oxycontin." Id. at 216. "When he moved to Nashville, he was addicted to Percocet, but could not obtain it. He went into withdrawal, was hospitalized for two weeks, and went to outpatient for two months." Id. at 211. The 2000 report concluded that husband suffered from "Mood Disorder, NOS, Opioid Dependence, in early full remission, Attention Deficit Hyperactivity Disorder, Combined Type, [and] Cluster Headache[s]." Id. at 212.

After reviewing husband's more recent medical records, the trial court found he "filled 530 days of what he characterized as pain pills which amounts to 1690 pain pills in 2 years. Of those pain pills, he filled 320 days' worth or 1450 pills of Ultram, Vicodin, Flexeril, and Robaxin." Id. at 170. Even after considering this extensive list, the court found the record "does not provide an accurate picture" because "there were multiple prescriptions from different doctors . . . being filled at other pharmacies." Id. The court also took note of husband's failure to alert his current doctors to his history of addiction to opioids, resulting in narcotics prescriptions between 2007 and 2008 for pain associated with an esophageal tear attributed to gastroesophageal reflux disease (GERD).[4] Wife also testified that she observed husband

---

[4] Husband repeatedly denied the GERD diagnosis. He claims his medical condition is better characterized as eosinophilic esophagitis. See App. at 564, 840B.

drinking his mother's prescription codeine cough syrup, id. at 925, and claimed he stole "fifteen pills" from wife's "mother's medical bag," id. at 850.

Regarding husband's erratic behavior, wife testified husband displayed peculiar behaviors throughout the marriage. Id. at 173. In 2008, he accused wife of "whoring" around and warned her to use condoms, but denied the next day any recollection of saying these things. Id. at 915-16. While on a trip to visit her sister, wife said husband left a voice message consisting solely of one of the children crying, which she claimed he did "if I went somewhere that he didn't want me to go." Id. at 917-18. Wife described various other incidents where husband said disparaging things about wife to the children and engaged in inexplicable conduct.[5] In addition, the trial court itself noted "that the husband has exhibited erratic and paranoid behaviors throughout this case." Id. at 173.

The trial court found wife "to be a reliable witness." Id. at 169. The court described husband as "exceedingly evasive, uncooperative, and paranoid throughout this case." Id. at 178. The court did not find husband to be reliable. "Many of his explanations did not make sense," the court found, and his testimony "was evasive and exhibited a selective memory when cross examined regarding these issues." Id. at 172. The court also took into account that husband had "not complied with previous orders of the Court regarding the children." Id. at 178. After presiding over many days of pretrial hearings and a lengthy trial, the court found:

> the husband has exhibited erratic and paranoid behaviors
> throughout this case. It is clear that he believes everyone in this

---

[5] In her testimony, wife stated husband showed aloofness when his son was injured (his tooth had punctured his lip), App. at 854-55; pulled out in front of oncoming traffic, stating his hope that cars would hit wife, id. at 357, 832; refused to let wife speak with the children over the phone while she was out of town, id. at 351; verbally abused wife with vile language, id. at 873; accused wife of betraying him by attending Nar-Anon meetings, id. at 858; locked wife out of the master bedroom, id. at 363-65; and silently stood over wife as she slept during the "middle of the night," id. at 874-75.

case is conspiring against him, including the guardian *ad litem*. He has not been forthcoming with providing his medical records to the guardian *ad litem* and has become increasingly rude to her. Throughout the proceedings, he has seemed understandably stressed. However, the Court also found him to be evasive, sarcastic, and uncooperative during the proceedings and has serious doubts as to his credibility. He certainly has exhibited a selective memory. He could recall the most specific details when questioned by his own attorneys but generally could not remember anything presented by the wife, the guardian *ad litem*, or the Court.

Id. at 173-74.

After reviewing the statutory factors governing its decision, the trial court found it "in the best interests of the children for supervised visitation to continue." Id. at 180-81. The supervision requirement (initially imposed by *pendente lite* orders)[6] should remain, the court stated, because it was "still extremely concerned about the husband's drug and alcohol use, as well as his erratic behavior. The Court is not comfortable that unsupervised visitation is appropriate at this point." Id. Though the court recited the conflicting evidence surrounding wife's claim of husband's molestation of their child, the court did not base its supervision requirement upon any concerns regarding this issue.[7]

We begin our review of the trial court's decision by restating the governing legal standard applicable to the husband's objection to supervised visitation and wife's insistence upon it. In Virginia, trial courts must consider the child's "best interests" when determining "custody or visitation arrangements" for the child. Code § 20-124.3 (listing various statutory factors). The trial court in this case examined the statutory factors and expressly applied the best-interests test in determining whether husband's visitation should be supervised.

---

[6] In its letter opinion, the trial court expressly acknowledged that *pendente lite* orders create no presumptive weight on the final decision. See Code § 20-103(E).

[7] On brief, husband correctly asserts: "Pertinent to the issues raised here, the Court did *not* find that any child abuse had occurred — whether sexual or any other kind." Appellant's Br. at 13 (emphasis in original).

On appeal, husband argues the trial court should have applied the constitutional actual-harm test, as required by Troxel v. Granville, 530 U.S. 57 (2000), and its progeny.  Husband contends this standard of proof, as applied to the issue of supervised visitation, required the trial court not merely to determine that supervision would be in the children's best interests but, rather, to specifically find "that unsupervised visits would endanger the child."  Appellant's Br. at 19.  We disagree.

The higher actual-harm standard, articulated in Troxel, governs child custody and visitation disputes between a fit *parent* and a third-party *nonparent* — not between two fit parents fighting among themselves.  "Custody and visitation disputes between two fit parents involve one parent's fundamental right pitted against the other parent's fundamental right.  The discretion afforded trial courts under the best-interests test, Code § 20-124.3, reflects a finely balanced judicial response to this parental deadlock."  Griffin v. Griffin, 41 Va. App. 77, 83, 581 S.E.2d 899, 902 (2003).[8]

_____

[8] The cases cited by husband on brief do not apply because they involve parent-nonparent disputes, e.g, Copeland v. Todd, 282 Va. 183, 198, 715 S.E.2d 11, 19 (2011) (terminating parental rights in favor of adoption by non-parents); State v. Letourneau, 997 P.2d 436, 446 (Wash. Ct. App. 2000) (reversing restriction on visitation with convict's children), or because they merely repeat language from Troxel or M.L.B. v. S.L.J, 519 U.S. 102 (1996), without analysis, e.g., Jackson v. Jackson, 999 So. 2d 488, 494 (Ala. Civ. App. 2007), or involve state law standards far different from the best-interests standard codified by Code § 20-124.3, e.g., Carr v. Broyles, 652 So. 2d 299, 304 (Ala. Civ. App. 1994) (citing Alabama rule applied when "a divorce judgment is modified . . . based on misconduct"); J.F.E. v. J.A.S., 930 P.2d 409, 413 (Alaska 1996) (expanding the "infer[ence] that the best interests of the child standard normally requires unrestricted visitation with the noncustodial parent" to require *findings* that specify how unsupervised visitation will adversely affect" the child (emphasis added)); In re Marriage of Parr, 240 P.3d 509, 512 (Colo. App. 2010) (noting "a requirement that visitation be supervised . . . implicates the endangerment standard" in Colorado); Cassell v. Cassell, 970 So. 2d 267, 272 (Miss. Ct. App. 2007) (applying "an appreciable danger of hazard cognizable in our law"); Matter of Tamara FF. v. John FF., 903 N.Y.S.2d 827, 830 (N.Y. App. Div. 2010) (remanding to "conduct a Lincoln hearing with these children"); Cervera v. Bressler, 855 N.Y.S.2d 658, 661-62 (N.Y. App. Div. 2008) (apparently holding allegations of child molestation and "stories of various incidents" not yet adjudicated by the trial court were facially

In other words, when fit parents assert their constitutional rights against each other, neither parent is entitled to primacy over the other. Their conflicting rights settle into oppositional equipoise, leaving the traditional best-interests standard as the sole basis of distinction between them. "Thus, faced with a contest in which one parent's fundamental rights were pitted against the other parent's fundamental rights," a trial court does not err by deciding the case based solely on the best-interests standard. Yopp v. Hodges, 43 Va. App. 427, 439, 598 S.E.2d 760, 766 (2004) (citing Griffin, 41 Va. App. at 83, 581 S.E.2d at 902). Troxel is simply "inapposite" in this intra-parental context. Id.[9] For this reason, the trial court in this case correctly employed the statutory best-interests standard under Code § 20-124.3 to mediate the dispute between wife's request for *supervised* visitation and husband's request for *unsupervised* visitation. Accord M.E.D. v. J.P.M., 3 Va. App. 391, 397, 350 S.E.2d 215, 219 (1986) (noting "a

---

"insufficient to show that unsupervised visitation would be 'detrimental to the child's well-being'"); Anderson v. Anderson, 771 N.E.2d 303, 308 (Ohio Ct. App. 2002) (applying a "direct adverse impact" test), a proposition we would not adopt even if we had the authority to do so.

[9] See also Enrique M. v. Angelina V., 94 Cal. Rptr. 3d 883, 889 (Cal. Ct. App. 2009) ("Troxel, which involved *nonparental* visitation, does not compel courts to apply a substantive due process analysis in resolving custody or custody related disputes *between parents*." (emphasis in original)); Rico v. Rodriguez, 120 P.3d 812, 818 (Nev. 2005) ("In a custody dispute between two fit parents, the fundamental constitutional right to the care and custody of the children is equal" and "the dispute in such cases can be resolved best, if not solely, by applying the best interest of the child standard."); In re R.A., 891 A.2d 564, 576 (N.H. 2005) (noting "strict scrutiny need not be applied to custody disputes . . . balancing the rights of two fit parents, both of whom have the same constitutional right to custody of their children"); Faucett v. Vasquez, 984 A.2d 460, 468 (N.J. Super. Ct. App. Div. 2009) ("When the dispute is between two fit parents, the best interest of the child standard controls . . . ."); Owenby v. Young, 579 S.E.2d 264, 267 (N.C. 2003) ("Furthermore, the protected right is irrelevant in a custody proceeding between two natural parents, whether biological or adoptive, or between two parties who are not natural parents . . . . In such instances, the trial court must determine custody using the 'best interest of the child' test."); In re Marriage of Momb, 130 P.3d 406, 410 (Wash. Ct. App. 2006) ("But no case has applied a strict scrutiny standard when weighing the interests of two parents." (citation omitted)); Arnold v. Arnold, 679 N.W.2d 296, 299 (Wis. Ct. App. 2004) ("So, when the Troxel court was speaking of fundamental rights in the raising of children, it was speaking to the existing disparity between natural parents and grandparents.").

court is not foreclosed from ordering some form of controlled visitation in order to rebuild a normal relationship if that is determined to be in the best interest of the child").

We next address the appellate standard of review, an equally important principle governing this case. The decision by a trial court to impose conditions on visitation involves an exercise of sound judicial discretion. On appeal, we do not review the statutory factors *de novo* to determine whether we agree or disagree with the trial court's decision. Nor do we "retry the facts or substitute our view of the facts for those of the trial court." Congdon, 40 Va. App. at 266, 578 S.E.2d at 838 (citation omitted). Instead, when dealing with discretionary decisions, "only 'when reasonable jurists could not differ can we say an abuse of discretion has occurred.'" Robbins v. Robbins, 48 Va. App. 466, 482, 632 S.E.2d 615, 623 (2006) (citation omitted).

Much of husband's argument on appeal devolves into an attack on the evidentiary weight of the evidence presented against him. The "evidence of alcohol abuse," husband complains, "was based entirely on Wife's testimony." Appellant's Br. at 24. And his witnesses, including his supervisors at work, testified they never saw him impaired. "But even if Wife's implausible testimony were to be believed," husband continues, "there still was no evidence that his was a continuing problem." Id. The same logic applies to wife's allegations of prescription drug abuse, husband contends.

Though seemingly framed as sufficiency challenges, these arguments do little more than retry the facts of the case on appeal. The only question before us is whether a reasonable jurist *could* find wife's testimony credible and, if so, whether it would provide a basis for a reasonable jurist to conclude that the best interests of the children are supported by wife's request for supervised visitation with husband. Given the record before us, the answer to both questions is yes.

Despite vigorous cross-examination, wife's testimony remained consistent and unshaken. Declaring wife a "reliable witness," the trial court found her "to be calm, organized, and cooperative throughout this case despite showing some anxiety on occasion." App. at 169. In contrast, the trial court found the husband was "exceedingly evasive," id. at 178, leaving the court with "serious doubts as to his credibility," id. at 174. "He certainly has exhibited a selective memory," the court added. Id. "He could recall the most specific details when questioned by his own attorneys but generally could not remember anything presented by the wife, the guardian ad litem, or the Court." Id.

Considering the testimony and evidence presented by wife, the trial court had ample basis to conclude the best interests of the children favored the requirement that husband's visitation continue to be supervised.[10] The various statutory factors composing the best-interests standard of Code § 20-124.3 do not reduce themselves into a simple formula. They do not purport to codify a rule that supervised visitation can only be required if specific criteria are met. The best-interests decision involves a holistic judgment, guided not only by the listed statutory factors, but also by such "other factors as the court deems necessary and proper to the determination." Code § 20-124.3 (factor 10).

Given the wide discretion invested in the trial court in such matters, we cannot hold that no reasonable jurist could have concluded supervised visitation would be in the children's best interests. The trial court focused on demonstrable risks supported by credible evidence:

---

[10] Husband cites Eichelberger v. Eichelberger, 2 Va. App. 409, 345 S.E.2d 10 (1986), for the broad proposition "that a court may interfere with a non-custodial parent's visitation rights only where such interference is necessary to protect the child." Appellant's Br. at 17. Eichelberger, however, addressed only the "narrow question" of whether the trial court erred in concluding a "custodial parent had the right to decide whether the child could engage in [a specific] activity" after liberal visitation had already been granted. Eichelberger, 2 Va. App. at 410, 413, 345 S.E.2d at 11, 12.

husband's abuse of alcohol and prescription drugs, coupled with his erratic behavior. Exposing two young children to these risks, the trial court reasonably concluded, was not in their best interests.[11] And, though no one can predict the future with certitude, Virginia law recognizes the "maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past." Petry v. Petry, 41 Va. App. 782, 793, 589 S.E.2d 458, 463 (2003). The trial court did just that in this case. The court also added that the supervision requirement was not necessarily permanent, but was considered "appropriate at this point." App. at 181. Husband remains free to ask the court to lift the supervision requirement at a later time upon the presentation of evidence justifying a modification of the court's order.

One last point deserves mention. Husband notes on brief that the trial court took into account that, during the *pendente lite* period, supervised visitation had been generally successful. "This is twisted logic," husband counters. Appellant's Br. at 27 n.10. "It is like rewarding a model prisoner with indefinite incarceration because he seemed to be doing so well in prison." Id. The trial court's decision, husband continues, can be analogized to using a "chainsaw" instead of a "scalpel" to address the contested issue. Id. at 28. If the purpose of this hyperbole was to persuade us, it fell short of doing so.

We think it quite sensible for the trial court to consider whether the *pendente lite* period of supervised visitation was successful. The court noted husband acted appropriately, and "[i]t is clear that the husband and children enjoy their time together." App. at 180. If that were not true — that is, if the supervision requirement caused the husband to misbehave or the children to

---

[11] Even jurisdictions that uncritically apply "rights of visitation" rhetoric to contests between parents acknowledge that "supervised visitation" may be used to ameliorate a "concern" over "risk" to the children. Pratt v. Pratt, 56 So. 3d 638, 641-42 (Ala. Civ. App. 2010) (affirming trial court "discretion in ordering supervised visitation" finding it "was necessary to protect the children from an unreasonable risk of physical or emotional harm" based on the court's "*concern* that the mother had developed an addiction to prescription pain medication" (emphasis added)).

- 11 -

despise their time with him — the trial court would have necessarily needed to rethink the available options. In this respect, the court's logic does not appear twisted. Nor does its decision appear to be the work of either a lumberjack or a surgeon, but rather that of a prudent jurist.

## B. THE GUARDIAN *AD LITEM*

Husband next argues the trial court erred in considering the guardian *ad litem* reports, which husband asserts contain inadmissible hearsay and opinion testimony. On appeal, husband also argues the court should not have considered the GAL's recommendation on the issue of supervised visitation. We find the first assertion moot and the second waived.

With respect to the GAL's reports, husband objected to them being treated as evidence and admitted as exhibits. See Plaintiff's Brief Re: Evidentiary Issues, at 4 (Nov. 15, 2010) (arguing that "the court should refrain from admitting the GAL's report[s] into evidence"); Plaintiff's Brief Regarding Guardian Ad Litem, at 8 (Nov. 15, 2010) (requesting that "the reports of the guardian *ad litem* be excluded from evidence"). At trial, husband's counsel again objected to the admission of the GAL's reports into evidence:

> I have to say that as for the guardian ad litem's report. I also object to that, parts of it, because there is a lot of hearsay, even hearsay on hearsay in there as well as the guardian ad litem's apparently expert opinions that she is offering that I don't think she is qualified to offer. . . . So there is no statutory basis for that to come into evidence and we object to it. She is free to make arguments based on the evidence that's before the Court, but she is not free to just submit a report that is itself evidence.

App. at 409-10.

In its letter opinion, the trial court noted that "husband objects to [the GAL's] written reports as hearsay; however, none of the reports have even been offered as evidence. Because no one is asking for their admission, the Court has no reason to rule on the admissibility of the reports." Id. at 168. The trial court acknowledged it was bound only by "the evidence and

- 12 -

testimony presented at trial." Id.  The court, therefore, did not admit the GAL's reports into evidence and did not rely on any inadmissible hearsay or expert opinion contained in the GAL's reports.[12]  This undisputed fact moots husband's argument on appeal that doing so was error.

With respect to the issue of supervised visitation, the trial court did take the GAL's recommendation into account.  See Letter Op. at 18 (App. at 178) ("The guardian *ad litem* recommends that supervised visitation continue unaltered at this point.").  At no point, however, did husband object to the trial court considering the GAL's recommendation on supervised visitation.  To the contrary, while objecting to the admissibility of the GAL's reports, husband expressly acknowledged that the court was nonetheless "bound to consider the recommendation" of the GAL.  See Plaintiff's Brief Regarding Guardian Ad Litem, at 8 (Nov. 15, 2010).[13]

On appeal, husband claims the trial court "attempted to finesse the issue."  Appellant's Br. at 40.  According to husband, by considering the GAL's recommendation but not her reports, the trial court embraced a "legal absurdity . . . reminiscent of the Cheshire Cat in *Alice in Wonderland* — whose grin remained even after the entire cat disappeared."  Id. at 41.  The alleged absurdity husband allegorically criticizes on appeal, however, is the very one he

---

[12] Compare Standards, *supra* n.1, at S-9 to -10 ("In certain circumstances, a summary of the GAL's *findings* with recommendations and the *basis for those recommendations* may be presented to the court . . . ." (comment H) (emphasis added)), with id. at S-2 (noting the GAL "acts as an attorney and not a witness" (introductory comment)); see generally Barbara A. Atwood, Representing Children Who Can't or Won't Direct Counsel: Best Interests Lawyering or No Lawyer at All?, 53 Ariz. L. Rev. 381, 423 (2011) (noting best interest attorneys "convey the child's world to the court through traditional avenues, including witness testimony, documentary evidence, and legal argument").  It is clear in Virginia, however, that if it becomes necessary to "testify as to a material matter" in order to "serve the best interests of his client," the guardian *ad litem* "must withdraw from the representation of the client."  Va. State Bar Committee on Legal Ethics, Guardian *Ad Litem* as Visitation Supervisor and Witness in Same Matter Opinion No. 1729 (Mar. 26, 1999).

[13] As one court put it, if "in her so-called 'report' she had referred to evidence that would properly come before the court from a source other than herself, her 'report' would have been the equivalent of an opening statement or closing argument and would have been quite proper."  Aksamit v. Krahn, 227 P.3d 475, 480 (Ariz. Ct. App. 2010).

expressly endorsed in the trial court. While contesting the admissibility of the GAL's reports, husband expressly conceded the trial court's obligation to "consider the recommendation" of the GAL. See Plaintiff's Brief Regarding Guardian Ad Litem, at 8 (Nov. 15, 2010).

We will not notice a claimed error "which has been invited by the party seeking to take advantage thereof on appeal." Rahnema v. Rahnema, 47 Va. App. 645, 663, 626 S.E.2d 448, 457 (2006) (citation omitted). A litigant cannot "approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory." Alford v. Commonwealth, 56 Va. App. 706, 709, 696 S.E.2d 266, 267 (2010) (citation omitted).[14] A closely related principle, Rule 5A:18, precludes appellants from raising for the first time on appeal "grounds asserted as a 'basis for reversal' of the trial court's judgment." White v. White, 56 Va. App. 214, 220, 692 S.E.2d 289, 292 (2010) (citation omitted). "Exceptions to Rule 5A:18 exist — but we employ them only in rare cases, and we never invoke them *sua sponte*." Id. For these reasons, we do not address husband's assertion that the trial court erred by considering the GAL's recommendation.

### C. DR. GANDERSON'S PSYCHOSEXUAL EVALUATION

In May 2009, the trial court ordered husband to undergo a psychosexual evaluation by Dr. Stephen Ganderson, whose fees and costs were to be split evenly between the parties. After evaluating husband and referring him to a polygraph examination, Dr. Ganderson issued his report in January 2010. At trial, husband objected to the report being admitted into evidence. The trial court denied the objection, but advised both parties that Dr. Ganderson, who was subpoenaed for trial, should take the stand and present his findings to the court. In his testimony,

---

[14] See also Bomar v. Bomar, 45 Va. App. 229, 234, 609 S.E.2d 629, 632 (2005); Holden v. Holden, 35 Va. App. 315, 324, 544 S.E.2d 884, 888 (2001); Steinberg v. Steinberg, 21 Va. App. 42, 50, 461 S.E.2d 421, 424 (1995).

Dr. Ganderson addressed most, if not all, of his findings outlined in his written report.  In both his testimony and his written report, Dr. Ganderson focused almost exclusively on husband's current psychosexual state for the purpose of determining whether the past allegations of — and future propensity for — child molestation could be confirmed or discredited.

We agree with husband that the trial court erred in admitting into evidence Dr. Ganderson's written report.  See Commonwealth v. Wynn, 277 Va. 92, 100, 671 S.E.2d 137, 141 (2009).  This conclusion, however, does not end our analysis.  As in all cases, we must determine whether the error prejudiced the parties.  Code § 8.01-678 makes "harmless-error review required in *all* cases."  Ferguson v. Commonwealth, 240 Va. ix, ix, 396 S.E.2d 675, 675 (1990) (emphasis in original and text in parenthetical); see generally Kirby v. Commonwealth, 50 Va. App. 691, 698, 653 S.E.2d 600, 604 (2007) (summarizing harmless error standard for nonstructural trial error).

The harmless error statute "puts a limitation on the powers of this court to reverse the judgment of the trial court — a limitation which we must consider on every application for an appeal and on the hearing of every case submitted to our judgment."  Walker v. Commonwealth, 144 Va. 648, 652, 131 S.E. 230, 231 (1926); see also Tynes v. Commonwealth, 49 Va. App. 17, 23 n.3, 635 S.E.2d 688, 690 n.3 (2006).  "The harmless error check on judicial power has never been a begrudged limitation, but rather one 'favored' by Virginia courts, because it grows out of the 'imperative demands of common sense,' and consequently has been 'deeply embedded in our jurisprudence.'"  Kirby, 50 Va. App. at 699, 653 S.E.2d at 604 (citations omitted).

Here, the trial court did not base its decision to continue husband's supervised visitation on any finding that husband molested his son or was somehow predisposed to do so based upon Dr. Ganderson's psychosexual evaluation report.  To be sure, nothing in the report asserted as much.  Instead, the court's decision rested, as husband acknowledges, on concerns about his

abuse of alcohol and prescription drugs along with his erratic behavior.[15] On these topics, the trial court relied primarily on wife's testimony and husband's medical and prescription drug records. To the limited extent that any inferences could arguably be drawn from Dr. Ganderson's written report on these topics, the impact of his extensive testimony rendered the report itself largely inconsequential. For these reasons, we view the trial court's erroneous admission of Dr. Ganderson's written report as harmless error.

### D. PARTIAL AWARD OF ATTORNEY FEES TO WIFE

In the trial court, wife requested an award of her attorney fees. The trial court granted the request in part, ordering husband to pay 30% of wife's fees and costs. The court found the "cost of litigation was greatly increased due to the husband's behavior and unwillingness to cooperate as described throughout this opinion." App. at 182. Husband argues on appeal the trial court erred in requiring him to pay any of wife's fees. We disagree.

"Whether to award attorney's fees 'is a matter submitted to the sound discretion of the trial court and is reviewable on appeal only for an abuse of discretion.'" Smith v. Smith, 43 Va. App. 279, 290, 597 S.E.2d 250, 256 (2004) (quoting Kane v. Szymczak, 41 Va. App. 365, 375, 585 S.E.2d 349, 354 (2003)). Given the "unique set of equities" in each case, "principles of appellate review steer clear of inflexible rules and focus instead on 'reasonableness under all the circumstances.'" Kane, 41 Va. App. at 375, 571 S.E.2d at 354 (quoting Joynes v. Payne, 36 Va. App. 401, 429, 551 S.E.2d 10, 24 (2001)).

The trial court's letter opinion recited various grounds for making a partial award of attorney fees to wife:

  ▪ "[T]he father has not complied with previous orders of the Court regarding the children. He has not been forthcoming with the guardian ad litem in her

---

[15] See *supra* n.7.

efforts to ascertain information pertinent to the best interests of the children or participated in family therapy." App. at 178.

- "He has been exceedingly evasive, uncooperative, and paranoid throughout this case." Id.

- "[Husband] has not been forthcoming with providing his medical records to the guardian ad litem and has become increasingly rude to her. Throughout the proceedings, he has seemed understandably stressed. However, the Court also found him to be evasive, sarcastic, and uncooperative during the proceedings and has serious doubts as to his credibility. He certainly has exhibited a selective memory. He could recall the most specific details when questioned by his own attorneys but generally could not remember anything presented by the wife, the guardian ad litem, or the Court." Id. at 173-74.

In addition, the record reflects that husband was represented by at least three law firms in the trial court.[16] Two attorneys appeared for husband at several hearings and at trial. Husband sought an award for the fees of only *one* of his attorneys, who was not even husband's lead counsel.[17] Nevertheless, the award requested for that one attorney amounted to $89,281 in fees and costs, R. 830 (Plaintiff's Ex. 4), significantly more than the $52,318 in fees and costs incurred by wife in the trial court. R. 863 (Defendant's Ex. 1).[18]

Given the totality of the circumstances in this case, the trial court did not abuse its discretion in awarding wife 30% of her attorney fees and costs.

---

[16] In the equitable distribution portion of its letter opinion, the circuit court also noted "the absurdity of arguing over such minimal amounts when the parties are clearly paying their attorneys well in excess of the disputed amounts to present their positions on these issues." App. at 166.

[17] During trial, husband's lead counsel declared, "I'm not a domestic relations lawyer, but it's my understanding that that is part of the trial . . . ." Trial Tr. at 53 (Oct. 21, 2010). Again at oral argument on appeal, husband's lead counsel volunteered that he was "not a divorce lawyer." Oral Argument Audio at 35:10.

[18] When asked by his attorney how much he had spent on the case, husband stated the number was "Well over a hundred thousand dollars." App. at 900. As directed by the trial court, wife's counsel "submitted an updated statement" including charges incurred after the parties had tendered the exhibits detailing their respective attorney's fees. Id. at 192.

### E. Equal Division of GAL Fees and Costs

Finally, husband contends the trial court erred by ordering him to pay half of the GAL's fees and costs. We find this assertion meritless. "The decision to apportion guardian fees between both parties or to one party alone also involves a matter within the chancellor's discretion." Kane, 41 Va. App. at 375, 585 S.E.2d at 354; Verrocchio v. Verrocchio, 16 Va. App. 314, 322, 429 S.E.2d 482, 487 (1993) ("Indivisible from the power of appointment is the associated power equitably to apportion the fees and expenses of the guardian *ad litem* as costs to the parties."). Nothing in this record suggests the trial court abused its discretion in apportioning the GAL's fees and costs equally between the parties.

### III. Conclusion

The trial court did not err by requiring husband's visitation be supervised "at this point" in time, App. at 181. Nor did the court commit any reversible error in its evidentiary rulings or award of fees and costs. We thus affirm.[19]

Affirmed.

---

[19] We deny wife's request for costs incurred on appeal. See generally Petry, 41 Va. App. at 796 n.7, 589 S.E.2d at 465 n.7; O'Loughlin v. O'Loughlin, 23 Va. App. 690, 695, 479 S.E.2d 98, 100 (1996).