■ In the Matter of NATALIE FRANCIS-MILLER, Petitioner, v ROMEET MILLER, Respondent. (Proceeding No. 1.) In the Matter of NATALIE FRANCIS-MILLER, Respondent, v ROMEET MILLER, Appellant. (Proceeding No. 2.) [975 NYS2d 74]—

In related child custody and family offense proceedings, the father appeals, as limited by his brief, from so much of an order of the Family Court, Rockland County (Eisenpress, J.), dated May 29, 2013, as, after a hearing, granted that branch of the mother's motion in proceeding No. 2 which was for permission to relocate with the parties' child to South Africa.

Ordered that the order is reversed insofar as appealed from, on the facts, without costs or disbursements, and that branch of the mother's motion which was for permission to relocate with the parties' child to South Africa is denied.

The parties were married in May 2005, and separated in June 2009. They are the parents of one child, a daughter, who was born in December 2008 and is now four years old. The mother was born and raised in South Africa, but emigrated to the United States in 2001, and is now a United States citizen. She and the father both currently reside in Rockland County. By order entered March 10, 2010, the mother was awarded sole legal and physical custody of the child. Shortly thereafter, by order entered April 23, 2010, the father was awarded visitation. The

mother, who alleges that the marriage was marred by incidents of domestic violence, subsequently obtained an order of protection against the father based on an incident in which he threatened to kill himself in front of her and the child. In September 2011, the mother filed a petition in the Family Court, Rockland County, alleging that the father had violated the order of protection. The violation petition was based on a heated argument which allegedly occurred during an exchange of the child for visitation.

While the mother's violation petition was pending, she moved to modify the existing custody and visitation orders by granting her permission to relocate with the child to South Africa. At an ensuing hearing, the mother testified regarding arguments and incidents of domestic violence that had occurred primarily before the parties' 2009 separation. She also described several incidents, both before and after the separation, in which the father had threatened to kill himself, and engaged in self-injurious acts, including hitting and choking himself. At the time of the hearing, the mother had been employed by a pharmaceutical company as a payroll analyst for more than six years. With respect to economic opportunities in South Africa, the mother testified that her plan, if permitted to relocate, was to work in her parents' business. Although she admitted that she would earn less than her current salary if she worked in the family business, she testified that her living expenses would be reduced because she could live rent-free in her parents' home, and her mother could assist with child care. The mother further testified that she had an extended, close-knit family in South Africa, and she and the child would each be able to have their own room in her parents' home. The mother acknowledged that she had been sexually abused as a child in South Africa by a maternal uncle, but claimed that this uncle had been "cut off" from the family.

The father denied that he had ever hit the mother, but admitted that he had threatened to commit suicide in the mother's presence on several occasions in 2009, and that he had once choked himself in front of her to the point where he lost consciousness. He had taken the advice of the court-appointed psychologist who evaluated the parties, and commenced treatment about four months earlier. The father opposed relocation, stating that he loved the child with all his heart, and expressing his belief that it was in the best interests of the child to have both parents available in her life. He also maintained that he wanted to be an involved father, and that Skype communications, email messages, and phone calls "with oceans in between

us" were not a substitute for his current relationship with the child, who lived only a quarter of a mile away from him.

The court-appointed psychologist who evaluated the parties found that the mother had excellent parental capacity, and that the child was more emotionally attached to her than to the father. Discussing why the mother desired to relocate, he observed that "[s]he is a single mother who is very alone in the United States, with all her relatives residing in South Africa. She feels isolated and has made the psychological and emotional decision to relocate and remove [the child] from the father so she can return to South Africa." In the psychologist's view, the main reason the mother felt so alone was that she had given up on the idea of making friends and building a support system in the United States. In the psychologist's opinion, the mother's feelings toward the father were ambivalent, because despite past incidents of domestic violence, she continued to rely on him at times to fulfil her emotional and sexual needs. According to the psychologist, the father was currently emotionally and mentally stable, and "[h]is parenting attitudes suggest relatively adequate or normal parental capacity with a low risk of neglectful or abusive behaviors." The psychologist recommended that the mother's relocation request be denied, concluding that the child needed a relationship with her father and her father's family, and that a good relationship could not be developed and maintained through Skype communications.

The Family Court granted the mother's motion for permission to relocate, concluding that the proposed relocation was in the best interests of the child. The court observed that the evidence painted a portrait of the mother as a woman who was isolated in this country with no family and few friends, and agreed with the psychologist that the mother's isolation was self-created. However, the court found that the psychologist's report and recommendation should be given little weight, primarily because the psychologist had discredited the mother's claim that she feared the father by pointing to the fact that after the separation, the mother invited the father to her home on different occasions, and initiated sexual encounters with him. The court credited the mother's allegations of domestic violence, and her explanation that she invited the father to her home to facilitate visitation with the child in a family setting, and initiated only one sexual encounter with him. The court further found that the mother was struggling financially and emotionally in the United States, and would be better off if permitted to return to South Africa, where she could work in the family business and live rent-free. The court directed the

mother to pay for the father to have four yearly visits with the child, two in South Africa, and two in the United States. We reverse, and deny that branch of the mother's motion which was for permission to relocate.

A parent seeking to relocate with a child bears the burden of establishing by a preponderance of the evidence that the proposed move would be in the child's best interests (*see Matter of Hirtz v Hirtz*, 108 AD3d 712, 713 [2013]; *Rubio v Rubio*, 71 AD3d 862, 863 [2010]; *Matter of Martino v Ramos*, 64 AD3d 657 [2009]). In determining whether relocation is appropriate, the court must consider a number of factors, which include "each parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements" (*Matter of Tropea v Tropea*, 87 NY2d 727, 740-741 [1996]). In assessing these factors, "no single factor should be treated as dispositive or given such disproportionate weight as to predetermine the outcome" (*id.* at 738). However, "the impact of the move on the relationship between the child and the noncustodial parent will remain a central concern" (*id.* at 739; *see Matter of Hirtz v Hirtz*, 108 AD3d at 713). "In the end, it is for the court to determine, based on all of the proof, whether it has been established by a preponderance of the evidence that a proposed relocation would serve the child's best interests" (*Matter of Tropea v Tropea*, 87 NY2d at 741). In relocation proceedings, this Court's authority is as broad as that of the hearing court, and a relocation determination will not be permitted to stand unless it is supported by a sound and substantial basis in the record (*see Matter of Hirtz v Hirtz*, 108 AD3d at 713-714; *Matter of McBryde v Bodden*, 91 AD3d 781, 782 [2012]).

Weighing the relevant factors here, we conclude that the Family Court's determination that the proposed relocation was in the child's best interests is not supported by a sound and substantial basis in the record. Although the Family Court was properly concerned about the father's history of domestic violence, the record is devoid of evidence that he has ever harmed the child or directed his anger toward her, and many of the incidents described by the mother involved the father's suicidal ideation and infliction of harm upon himself. Significantly,

the court-appointed psychologist found that the father was currently emotionally and mentally stable, and at low risk of neglectful or abusive behavior toward the child. Moreover, the record shows that the mother sought permission to relocate primarily because she feels lonely and isolated in the United States, and not to escape domestic violence (*cf. Matter of Eddington v McCabe*, 98 AD3d 613, 615 [2012]). The record also establishes that the father consistently exercises his right to visit the child twice a week, and that he desires to spend more time with her (*see Matter of McBryde v Bodden*, 91 AD3d at 782). Further, there is no economic necessity for the proposed relocation because the mother has been steadily employed as a payroll analyst for more than six years. Although the mother testified that the proposed relocation would offer her economic benefit because she can live rent-free in her parents' home and her mother can assist her with child care, these benefits do not outweigh the drastic reduction in the quantity and quality of the child's contacts with the father which would ensue if the child relocated to a country so distant from the United States that, according to the parties, it requires a 24-hour-long flight to reach (*see id.* at 782). While we are mindful that the attorney for the child supports relocation and that her position is entitled to some weight, it is not dispositive (*see Matter of Jackson v Coleman*, 94 AD3d 762, 763 [2012]; *Matter of Haimovici v Haimovici*, 73 AD3d 1058 [2010]). Under these circumstances of this case, the proposed relocation is not in the best interests of the child (*see Matter of McBryde v Bodden*, 91 AD3d at 782; *Rubio v Rubio*, 71 AD3d at 863-864; *Matter of Giraldo v Gomez*, 49 AD3d 645, 646 [2008]; *Matter of Willis-Marsh v Wilkerson*, 22 AD3d 977, 978-979 [2005]; *Matter of Herman v Villafane*, 9 AD3d 525, 527-528 [2004]). Accordingly, that branch of the mother's motion which was for permission to relocate with the child should have been denied. Eng, P.J., Dickerson, Chambers and Hall, JJ., concur.